### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Victor Alfonso Rodriguez Quezada, on behalf of himself and all others similarly situated**<br>**84 Bradford Drive**<br>**Schwenksville, PA 19473** | : : : : : | **Case No.  2:20-cv-05193** |
| **Brendan Monaghan, on behalf of himself and all others similarly situated**<br>**1585 Harvest Drive**<br>**Yardley, PA 19067** | : : : : | |
| **Plaintiffs** | : : | |
| **vs.** | : : : | |
| **ArbiterSports, LLC**<br>**235 W. Sego Lily Drive, Suite 200**<br>**Sandy, UT 84070** | : : : | |
| **Defendant** | : : | |

### CLASS ACTION COMPLAINT
### AND DEMAND FOR JURY TRIAL

Plaintiffs, Victor Alfonso Rodriguez Quezada and Brendan Monaghan ("Plaintiffs"), individually and on behalf of the Class defined below of similarly situated persons, file this Class Action Complaint against Defendant, ArbiterSports, LLC ("ArbiterSports" or "Defendant") based upon their personal knowledge of their own acts and, otherwise, upon information and belief, including based upon the investigation of counsel.

## I.    INTRODUCTION

1.    ArbiterSports, LLC, is a sports software company headquartered in Sandy, Utah. For over 35 years, ArbiterSports has been a leader in youth sports, K-12 and higher education athletic event management, offering tools and technologies to enable athletic departments and sports leagues across the nation to simplify the process of managing athletic events, assigning

1

sports officials and event workers, paying sports officials and event workers, and informing participants.

2.      State athletic associations, commissioners, athletic directors, assigners of sports officials, sports officials and event workers use ArbiterSports' products and services for control and visibility over the entire athletic event process.

3.      In order to utilize the full range of ArbiterSports' athletic event management and payment services, sports leagues and associations opting to utilize ArbiterSports' software and products require their sports officials and event workers to register online with ArbiterSports in order to use the ArbiterSports platform, receive assignments to games, contests or events and to receive payment for their services.

4.      Through the online registration process with ArbiterSports, these sports officials and event workers are required to create account usernames and passwords and provide ArbiterSports with highly sensitive and confidential personal information, including their names, contact information, Social Security numbers, and in the vast majority of circumstances, their personal banking information.

5.      Without registering online with ArbiterSports, these sports officials and event workers would not be able to receive assignments from the sports leagues and associations who utilize ArbiterSports' products and services.

6.      ArbiterSports collects and stores the highly sensitive and confidential personal information of each of these individual users, including approximately 540,000 sports officials and event workers, in one centralized database (the "ArbiterSports Database" or "Database").

7.      Through written marketing materials and online informational materials, including its Privacy Policy, ArbiterSports has, at all relevant times, held its platform, software

and services out to the public, including Plaintiffs and Class Members, as being "safe", and has represented that it utilizes "industry standards" with respect to data security practices and that ArbiterSports' website is in compliance with federal and state statutes and regulations.

8. Despite the fact that ArbiterSports was storing such highly sensitive and confidential personal information in its Database, ArbiterSports failed to utilize and implement the most basic security precautions to protect its users' data from attackers.

9. On or around August 25, 2020, ArbiterSports mailed and/or emailed a notices to its individual users, including Plaintiffs and the Class Members, notifying them that it had "recently identified and addressed a data security incident."

10. As reported by ArbiterSports in the August 25, 2020 notice, ArbiterSports became aware of a data security breach (the "Data Breach") in which an attacker had accessed the ArbiterSports Database and both accessed and obtained the highly sensitive and confidential personal information of its individual users, including their account usernames and passwords, names, addresses, dates of birth, email addresses and Social Security numbers ("Personal Information"). The attacker was reportedly also able to decrypt data that had been encrypted, including passwords and Social Security numbers, and also reportedly demanded a ransom for the deletion of the files that had been accessed and obtained. ArbiterSports reported that it reached an agreement with the attacker and, presumably, paid a ransom, and received "confirmation" from the attacker that the data files accessed by the attacker had been deleted.

11. ArbiterSports failed to take the most basic industry-accepted data security precautions that would have prevented the attacker from accessing the ArbiterSports Database and would have protected ArbiterSports' individual users' Personal Information. Instead, ArbiterSports used grossly inadequate computer systems and data security practices that allowed

the attacker to easily access the ArbiterSports Database and to access and obtain the users' Personal Information. ArbiterSports also failed to take adequate data security measures after first learning of the Data Breach in order to prevent further compromise of its individual users' Personal Information and prevent or otherwise limit the attacker's ability to access, obtain and decrypt the users' Personal Information.

12.     ArbiterSports compounded its failures by then failing to adequately provide timely and accurate notice to Plaintiffs and Class Members of the Data Breach. Instead, ArbiterSports waited at least two months to provide notice to its users of the Data Breach and, when it did provide such notice to its users of the Data Breach, it improperly communicated that, by reaching an agreement with the attacker and by paying the ransom in return for "confirmation" that the stolen files had been deleted, ArbiterSports had "identified and addressed" the data security incident – thus, improperly misrepresenting and/or suggesting to its users, including to 540,000 sports officials and event workers across the United States, that it had rectified the problem, when it clearly had not.

13.     Additionally, although in its August 25, 2020 notice, ArbiterSports stated that it had "implemented additional measures and changes to enhance the security of [its] network," ArbiterSports did not state or indicate that it had third-party validation of those additional security measures to ensure their efforts were meaningful or impactful. Accordingly, upon information and belief, ArbiterSports has still not implemented necessary computer systems and data security practices to ensure that its users' Personal Information, which continues to be stored in the ArbiterSports Database, will not be accessed or stolen by additional attacks.

14.     Because ArbiterSports failed to provide even minimally adequate computer systems and data security practices, its individual users, including approximately 540,000 sports

4

officials and event workers, have been and will be forced to suffer the serious adverse consequences, including the exposure of their confidential Personal Information for at least two months before even being first notified of the Data Breach by ArbiterSports, the actual misuse of the confidential Personal Information of various users by criminals, as well as the increased and imminent risk of their Personal Information being made available by the attacker and/or other criminals for purchase on the "dark web" – an underground or "black market" part of the internet accessed by an anonymizing browser that is not indexed by search engines, where rampant illegal commerce occurs.

15.    ArbiterSports' individual users, including Plaintiffs and Class Members, have sustained immediate, tangible injury as a direct result of the Data Breach. They have suffered the loss of their legally protected interest in the confidentiality and privacy of their Personal Information and the decreased value of their Personal Information. They have and will expend significant time and expense related to monitoring their financial accounts and other online accounts for fraudulent activity, and they are at an increased, imminent risk of fraud and identity theft. ArbiterSports' individual users' injuries are ongoing, as their Personal Information continues to be stored in the ArbiterSports Database which, upon information and belief, continues to fail to utilize basic data security precautions and they continue to face a significant and imminent risk of identity theft and fraud from not only the ArbiterSports Data Breach, but also from further data breaches of the ArbiterSports Database due to ArbiterSports' ongoing inadequate data security practices. Additionally, upon information and belief, various users have already been the victims of the actual misuse of the confidential Personal Information by criminals as a result of the Data Breach.

16.     Plaintiffs seek to remedy these harms through this class action filed on behalf of themselves and all similarly situated ArbiterSports' users consisting of sports officials and event workers residing in the United States, or alternatively, a subclass of those users consisting of sports officials and event workers residing in the Commonwealth of Pennsylvania, whose sensitive Personal Information was provided to ArbiterSports and maintained on the ArbiterSports Database, and whose Personal Information was accessed, compromised or stolen from ArbiterSports as a result of the Data Breach announced by ArbiterSports on or around August 24, 2020. Plaintiffs and Class Members seek remedies including, but not limited to, reimbursement of losses due to identity theft and fraud and other out-of-pocket costs, compensation for time spent in response to the Data Breach, five years of credit monitoring and identity theft insurance, and injunctive relief requiring substantial improvements in ArbiterSports' data security practices and systems.

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action based on diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action involving more than 100 putative Class Members, the amount in controversy exceeds Five Million Dollars ($5,000,000), exclusive of interest and costs, and at least one Class Member is a citizen of a state different from ArbiterSports. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

18.     This Court has personal jurisdiction over ArbiterSports for at least the following reasons: (i) ArbiterSports regularly conducts business or solicits business, engages in other persistent courses of conduct and/or derives substantial revenue from products and/or services provided to individuals and entities in this District and in this Commonwealth; and (ii)

ArbiterSports has purposefully established substantial, systematic and continuous contacts with this District and expects or should reasonably expect to be hauled into court here. Thus, ArbiterSports has sufficient minimum contacts with this District, and this Court's exercise of jurisdiction over ArbiterSports will not offend traditional notions of fair play and substantial justice. Through its business operations in this District, ArbiterSports intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because ArbiterSports regularly does business in this District and is subject to personal jurisdiction in this District.

## III.    THE PARTIES

### A.     Plaintiffs

#### 1.     Plaintiff Victor Alfonso Rodriguez Quezada

20.     Plaintiff Victor Alfonso Rodriguez Quezada (referred to herein as "Victor Rodriguez") is a natural person and citizen of the Commonwealth of Pennsylvania and a resident of Montgomery County. Plaintiff Victor Rodriguez is a soccer official who officiates soccer contests at the collegiate-level and below, throughout the Commonwealth of Pennsylvania, as well as in the State of New Jersey and in the State of Delaware.

21.     Plaintiff Victor Rodriguez was, at all relevant times, a registered user of the ArbiterSports software and was required by his assigners and by sports conferences and/or associations to register online with and to regularly use ArbiterSports to receive game assignments as well as to receive payment for his services as a sports official.

7

22.     ArbiterSports collected and received Plaintiff Victor Rodriguez's Personal Information, including his account username and password, name, address, date of birth, email address and Social Security number, which ArbiterSports maintained in its Database. Plaintiff Victor Rodriguez also provided ArbiterSports with his personal banking information – specifically, the account number and routing number for his Wells Fargo checking account, which, upon information and belief, ArbiterSports also maintained in its Database.

23.     Plaintiff Victor Rodriguez received a notice from ArbiterSports on or around August 25, 2020 informing him that his Personal Information had been compromised as a result of the ArbiterSports Data Breach.

24.     In July 2020, after the ArbiterSports Data Breach had occurred – but before Plaintiff Victor Rodriguez received notice from ArbiterSports of the Data Breach – Plaintiff Victor Rodriguez experienced fraudulent charges to his personal Wells Fargo checking account, which had been linked to his online ArbiterSports account at the time of the ArbiterSports Data Breach. Wells Fargo alerted Plaintiff Victor Rodriguez to the fraudulent charge, and froze both of his Wells Fargo bank accounts, including his checking account and his savings account, as well as his debit card, to prevent any further fraudulent charges from being made. As a result, Plaintiff Victor Rodriguez was forced to open a new checking account and a new savings account with Wells Fargo and to have a new debit card issued in his name. It took approximately seven (7) days for the new debit card to arrive at his home address, during which time he did not have the use of his debit card to make purchases. Additionally, Plaintiff Victor Rodriguez was required to take additional steps to change his banking information on other billing websites in order to provide the new information for his new checking account and new debit card. This entire process has been time-consuming, concerning and burdensome.

8

25.     To his knowledge, Plaintiff Victor Rodriguez had never experienced fraudulent charges to his Wells Fargo checking account prior to the ArbiterSports Data Breach.

26.     To his knowledge, Plaintiff Victor Rodriguez has not received any notices from other entities stating that his Personal Information was stolen in a data breach. To the best of his knowledge, there are no obvious sources of this fraudulent charge other than the ArbiterSports Data Breach.

27.     As a result of the ArbiterSports Data Breach, Plaintiff Victor Rodriguez now reviews his financial accounts and other online accounts more closely than he otherwise would have. He has also his passwords for his ArbiterSports account as well as other online accounts as a precaution. These actions have been time-consuming, concerning and burdensome.

28.     Had Plaintiff Victor Rodriguez known that ArbiterSports had inadequate data security practices and protections in place, he would not have registered online with ArbiterSports and/or provided ArbiterSports with his highly sensitive Personal Information.

**2.     Plaintiff Brendan Monaghan**

29.     Plaintiff Brendan Monaghan is a natural person and citizen of the Commonwealth of Pennsylvania and a resident of Bucks County. Plaintiff Brendan Monaghan is a basketball, lacrosse and football official who officiates basketball, lacrosse and football games throughout the Commonwealth of Pennsylvania.

30.     Plaintiff Brendan Monaghan was, at all relevant times, a registered user of the ArbiterSports software and was required by his assigners and by sports conferences and/or associations to register online with and to regularly use ArbiterSports to receive game assignments as well as to receive payment for his services as a sports official.

9

31.     ArbiterSports collected and received Plaintiff Brendan Monaghan's Personal Information, including his account username and password, name, address, date of birth, email address and Social Security number, which ArbiterSports maintained in its Database. Plaintiff Brendan Monaghan also provided ArbiterSports with his personal banking information, which, upon information and belief, ArbiterSports also maintained in its Database.

32.     Plaintiff Brendan Monaghan received an email from ArbiterSports on or around August 25, 2020 informing him that his Personal Information had been compromised as a result of the ArbiterSports Data Breach.

33.     After receiving the August 25, 2020 notice email from ArbiterSports, as a precaution, Plaintiff Brendan Monaghan cancelled his personal bank account that was linked to his ArbiterPay account, and opened a new personal bank account, requiring him to take additional steps to change his banking information on other billing websites in order to provide the new information for his new personal bank account. These actions have been time-consuming, concerning and burdensome.

34.     As a result of the ArbiterSports Data Breach, Plaintiff Brendan Monaghan now reviews his financial accounts and other online accounts more closely than he otherwise would have. He has also reset his passwords for his ArbiterSports account as well as other online accounts as a precaution. These actions have been time-consuming, concerning and burdensome.

35.     Additionally, as a precaution, after receiving the August 25, 2020 notice email from ArbiterSports, Plaintiff Brendan Monaghan terminated his ArbiterPay account and attempted to open a new ArbiterPay account, but has been unsuccessful in his attempts to do so. He has also called ArbiterSports and left numerous messages about his difficulty in reopening a new ArbiterPay account but has not received a return phone call. As a result, Plaintiff Brendan

Monaghan cannot get paid for any of the high school and middle school games he has worked since he terminated his ArbiterPay account, and will not be able to receive payment until he is able to open a new ArbiterPay account. This process has also been time-consuming, concerning and burdensome.

36.     Had Plaintiff Brendan Monaghan known that ArbiterSports had inadequate data security practices and protections in place, he would not have registered online with ArbiterSports and/or provided ArbiterSports with his highly sensitive Personal Information.

**B.     Defendant**

37.     Defendant, ArbiterSports, LLC, formerly known as Refpay, LLC, doing business as ArbiterPay and Refpay.com, is a limited liability company existing under the laws of the State of Utah, with its principal place of business located at 235 W. Sego Lily Drive, Suite #200, Sandy, Utah 84070. Upon information and belief, based on the citizenship of its members, ArbiterSports is a citizen of the States of Utah and California. ArbiterSports is a company that conducts business throughout the United States, including substantial business in the Commonwealth of Pennsylvania.

**IV.     FACTUAL ALLEGATIONS**

**A.     History of ArbiterSports**

38.     ArbiterSports is a sports administration and software company headquartered in Sandy, Utah, that has been a leader in athletic event management for over 35 years, offering athletic departments, associations and leagues with tools and technologies to enable them to simplify the process of managing athletic events, assigning and paying sports officials and event workers, and informing their participants.

11

39.     ArbiterSports started in 1984 as Advance Business Technology, Inc., which used computer technology to aid assigning athletic officials to sports events. The initial program was called "The Arbiter". In 2011, The Arbiter was renamed ArbiterOne. ArbiterOne has since evolved into a scheduling and assigning software system.

40.     Between 2005 and 2008, the National Collegiate Athletic Association ("NCAA") identified a need to increase and improve the pipeline of officials for sporting events among its member institutions. At the same time, a company called "eOfficials" was developing a technology platform to improve the education and training of sports officials. Simultaneously, another company called "RefPay" was developing a software process to handle the electronic payment of sports officials for event sponsors. In September 2008, the NCAA purchased a majority interest in The Arbiter, eOfficials and RefPay, with the goal of providing sports officials and their assignors with more efficient, comprehensive, and consolidated online capabilities. Each company continued to operate independently, maintaining their individual market emphases and software platforms.

41.     Over time, the three companies, The Arbiter, eOfficials and RefPay, began to integrate their once-separate operations and they consolidated at the end of 2014. The consolidated company was named ArbiterSports. The original founder of The Arbiter exited the business; and the founders of eOfficials and RefPay retained their minority interest. The NCAA retained a majority interest in the consolidated company, ArbiterSports.

42.     In August 2017, the NCAA sold its majority ownership interest in ArbiterSports to Serent Capital Management Company, LLC ("Serent Capital"), a San-Francisco-based private equity firm focused on investing in high-growth technology and services businesses, for Twenty-Two Million Five Hundred Thousand Dollars ($22,500,000.00) in cash and a Two Million Eight

Hundred Thousand Dollars ($2,800,000.00) note receivable, making Serent Capital the majority owner of ArbiterSports.

43.     Upon information and belief, Lance Fenton, a principal at Serent Capital, assumed the role of Chairman of the Board, and has since that time provided the President/CEO of ArbiterSports with significant operational and strategic support.

44.     In June 2019, ArbiterSports hired a San Francisco technology executive, Kyle Ford, to serve as the President/CEO and the former President/CEO, Jeff Triplette, transitioned to the role of Executive Chair.

45.     The NCAA continues to utilize many ArbiterSports products and services and ArbiterSports maintains strong partnerships with the NCAA, the National High School Federation ("NFHS"), the National Association of Intercollegiate Athletics ("NAIA"), US Lacrosse, the National Junior College Athletic Association ("NJCAA") and most state high school athletic associations in the United States. The ArbiterSports platform is also used by sports organizations in over ten (10) countries around the world.

46.     Thousands of schools, sports leagues and associations across the United States make nearly fifteen million (15,000,000) game assignments to more than five hundred thousand (500,000) sports officials every year using ArbiterSports technology.

**B.     ArbiterSports' Software Products, Website and Database**

47.     ArbiterSports provides a cloud-based suite of software and payments solutions that enable assigners of sports officials, athletic directors, organizers, and sports officials to manage their responsibilities in game and event scheduling and payment.

48.     ArbiterSports' product suite offerings include solutions for game officiating management (ArbiterOne), eligibility/education (ArbiterWorks), payments and contractor

compliance (ArbiterPay), and mobile access (ArbiterMobile). ArbiterSports also offers game scheduling and management (ArbiterGame), athlete registration (ArbiterAthlete), and game data distribution (ArbiterLive).

49.     ArbiterOne is the ArbiterSports assigning system that helps sports leagues and associations in managing schedules and assigning sports officials and event workers by providing assigners with a complete view of all of their sports officials and event workers, as well as their officials' and event workers' availability and contact information along with photo ID to eliminate assigning mistakes and confusion. Through ArbiterOne, assigners can provide all necessary game-related information, send automated game schedule reminders, and send email communications to the officials and event workers notifying them of cancellations or changes in schedule.

50.     ArbiterWorks is a platform that provides training and eligibility content for sports officials. Through ArbiterWorks, leagues and associations build an online portal where their sports officials can have access to training and educational tools, have online access to a searchable rules database, and take tests and quizzes for eligibility. Through ArbiterWorks, sports officials are able to register online with the sports league or association, pay their annual registration fees, complete required background checks and receive other required and/or available training on one single platform.

51.     ArbiterGame is an event management software designed for school athletic departments that allows athletic directors to schedule games, manage teams, create rosters, arrange transportation, change venues and times, send important notifications, review officiating crews and individual officials, pay sports officials and other event staff electronically (through its integration with ArbiterPay), as well as to track the entire process online from start to finish.

52.     ArbiterPay is an electronic payment network that integrates with ArbiterOne and ArbiterGame and allows groups ranging from elite collegiate conferences to local recreation departments to view the schedule of sports officials and event workers, verify their completed contest assignments, and click a button to pay the officials and event workers immediately following the contests through an electronic payment (i.e., ACH transfer or a wire transfer).

53.     ArbiterSports collects and stores the sports officials' and event workers' Personal Information and issues 1099 IRS tax forms to each payee.

54.     In order to make payments through ArbiterPay, ArbiterSports requires each member organization (conference, league, college or university, school, or association) to establish an account with ArbiterPay and to deposit funds into that account, and ArbiterSports charges the organization a flat fee for each transaction. Once the money is transferred to the sports officials' or event workers' ArbiterPay accounts, ArbiterPay allows the sports officials or event workers the option of accessing their payments through an electronic transfer of funds directly to their designated personal bank accounts, through the use of an ArbiterPay debit card (officials pay ArbiterSports a nominal point-of-sale convenience fee each time they use their prepaid card), or through the issuance of a paper check (officials pay ArbiterSports approximately a $7.00 fee for each paper check issued). Member organizations have made over One Billion Dollars ($1,000,000,000.00) in payments to sports officials and event workers using ArbiterPay.

55.     In order to provide its full range of athletic event management and payment services, ArbiterSports requires that its member organizations' sports officials and event workers register online with ArbiterSports and provide ArbiterSports with their highly sensitive personal

and confidential information in order to use the ArbiterSports platform, to meet eligibility requirements, to be assigned to contests or events, and to receive payment for their services.

56.     Specifically, the ArbiterSports registration process requires sports officials and event workers to create an online account with ArbiterSports and to provide ArbiterSports with personal identifying information, including their names, home addresses, email addresses, phone numbers, photo IDs, background check information, personal bank account numbers and routing numbers, and Social Security numbers.

57.     ArbiterSports collects and stores the Personal Information of its individual users, which includes approximately 540,000 officials and event workers, in one centralized database (the "ArbiterSports Database").

58.     In registering online through ArbiterSports and providing their Personal Information, the individual users of ArbiterSports' products and services, including Plaintiffs and Class Members, justifiably relied upon ArbiterSports to maintain and ensure the security of their Personal Information – most of which were the types of information that federal and state law requires companies to take security measures to protect – and these individual users, including Plaintiffs and Class Members, would not have otherwise disclosed their Personal Information to ArbiterSports had they known of the inadequate security protections and procedures in place to safeguard their highly sensitive Personal Information.

C.     **ArbiterSports' Promises Related to Security of Stored Information**

59.     Through written marketing materials and online informational materials, ArbiterSports has, at all relevant times, held its platform, software and services out to the public, including Plaintiffs and Class Members, as being "safe", and has represented that it utilizes

16

"industry standards" with respect to security and that ArbiterSports' website is in compliance with federal and state statutes and regulations.

60.    ArbiterSports has made written representations to its users, including to Plaintiffs and Class Members, that it would protect the users' Personal Information.

61.    At all relevant times, ArbiterSports published a Privacy Policy on its website, www.arbitersports.com, which represented that the company was committed to its users' privacy, that the company prioritized the protection of its users' privacy and information, and that, although the company was not guaranteeing "perfect security," the company would provide reasonable "industry-standard" security methods. The ArbiterSports Privacy Policy stated, among other things, as follows (emphasis added):

> ArbiterSports, LLC ("we," "our") has created this privacy policy (this "Privacy Policy") in order to demonstrate **our firm commitment to your privacy**. This document describes the practices of ArbiterSports with respect to the collection of user information and the use, storage, protection, and disclosure of such information. ....

> This document only applies to user information collected from our websites (the "ArbiterSports Websites"), including but not limited to those located at www.arbitersports.com, www.arbiterpay.com, and www.refpay.com ....

> Security

> **Protecting your privacy and your information is a priority at ArbiterSports.** We do not rent or sell the personal financial information you provide to us. **We use industry-standard methods to protect your personally identifying information from unauthorized access.** Among other techniques, we usually store such information on a computer behind a "firewall" in a secure location, and we take measures to restrict the number of employees internally who can access such data. When our registration or order form asks users to enter sensitive information (such as a credit card number), that information is encrypted and protected using industry-standard encryption technology, such as 128-bit encryption SSL (Secure Socket Layers). In addition, as an added security measure, if you

use a credit card to make a purchase on our site, an ArbiterSports representative may call you to verify the transaction.

While we use SSL encryption to protect sensitive information online, we also take steps to protect user information off-line. Access to all of our users' information, not just the sensitive information mentioned above, is restricted in our offices. Only employees who need the information to perform a specific job (for example, our billing clerk or a customer service representative) are granted access to personally identifying information. Furthermore, employees are kept up-to-date on our security and privacy policies and practices, and such policies and practices are strictly enforced. Finally, the servers on which we store personally identifying information are kept in a secure environment.

62.     ArbiterSports also published a document on its website titled "A Safer Solution for Officiating Payments" on August 22, 2016 in which it represented, among other things, as follows (emphasis added):

The Safer Bet for Officials

Identity theft is something that we have to consider nowadays.  Most of us take precautions in shredding our mail and keeping our information private.  Unfortunately, when a school isn't using an electronic sports officials payment system, it creates vulnerabilities and opens the door to identity theft. Many schools do not have proper training on how to keep important documents, such as W-9 forms, safe and secure. You will see these documents out in the open like the scenario described above, or loose in someone's desk. **ArbiterPay fixes this problem as it allows for electronic documents and payments that are kept in a secure environment. As an official, you don't need to worry about your private information getting lost or ending up in the wrong hands**.

The Safer Bet for Schools

Schools do not intentionally mishandle officials' documents, but without the proper training and monitoring, there is a disaster waiting to happen. **With ArbiterPay, schools can reduce their liability when it comes to sensitive information.** Plus, using an electronic system to handle payments, and even 1099s, can reduce workload and is generally cheaper than manual processing. It eliminates vouchers, check processing and postage.

**D.     ArbiterSports Had An Obligation To Protect Personal Information Under Federal And State Law And Applicable Standards Of Care**

63.     ArbiterSports' duty, is in part, based on federal and state legislatures' passage of laws to ensure the protection and security of sensitive Personal Information in the company's files.

64.     ArbiterSports was/is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45, from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission has found that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the Federal Trade Commission Act. See e.g., *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3d Cir. 2015).

65.     As a business engaging in financial activities, ArbiterSports is also an entity covered by Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et. seq.* ArbiterSports had an "affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801.

66.     ArbiterSports is also required by various state laws and regulations, including but not limited to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. §§ 201-1 *et seq.*, and the Pennsylvania Breach of Personal Information Notification Act, 73 Pa.C.S. §§ 2301 *et seq.*, to protect the privacy and security of Plaintiffs' and Class Members' Personal Information, including Social Security numbers, and to disclose the Data Breach to them in a timely and accurate fashion so that, among other things, Plaintiffs and Class Members could take appropriate measures to avoid fraud or identify theft.

19

67.     In addition to its obligations under federal and state laws, ArbiterSports owed a duty to its users, including Plaintiffs and Class Members, who entrusted the company with sensitive Personal Information, to exercise reasonable care in obtaining, retaining, securing, safeguarding, and protecting the Personal Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. ArbiterSports owed a duty to its users to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the Personal Information of its users, including Plaintiffs and Class Members.

68.     ArbiterSports owed a duty to its users, including Plaintiffs and Class Members, who entrusted the company with their Personal Information, to design, maintain, and test its computer systems to ensure that the Personal Information in ArbiterSports' possession was adequately secured and protected.

69.     ArbiterSports owed a duty to its users, including Plaintiffs and Class Members, who entrusted the company with Personal Information, to create and implement reasonable industry-standard data security practices and procedures to protect the Personal Information in its possession, including but not limited to, adequately training its employees and others who accessed the Personal Information within its computer systems on how to adequately protect Personal Information and creating an incident response plan to minimize the scale and damage of data breaches and ransomware attacks, including the Data Breach.

70.     ArbiterSports owed a duty to its users, including Plaintiffs and Class Members, who entrusted the company with Personal Information, to implement processes that would detect a breach of their data security systems in a timely manner.

20

71.     ArbiterSports owed a duty to its users, including Plaintiffs and Class Members, who entrusted the company with Personal Information, to properly act upon data security warnings and alerts in a timely fashion.

72.     ArbiterSports owed a duty to its users, including Plaintiffs and Class Members, who entrusted the company with Personal Information, to disclose if its computer systems and data security practices were inadequate to safeguard individuals' Personal Information from theft because such an inadequacy would be a material fact in the decision to utilize the products and services from ArbiterSports, or to entrust their Personal Information with ArbiterSports.

73.     ArbiterSports owed a duty to its users, including Plaintiffs and Class Members, who entrusted the company with Personal Information, to disclose data breaches to its users, in a timely, accurate and complete manner, when they occurred.

74.     ArbiterSports owed a duty of care to its users because they were foreseeable and probable victims of any inadequate data security practices. ArbiterSports knew that a breach of its data systems would cause its users, including Plaintiffs and Class Members, to incur damages.

75.     ArbiterSports was – and at all relevant times has been – aware that the Personal Information data that it obtains and possesses is highly sensitive and could be used for nefarious purposes by third parties, such as perpetrating identity theft and making fraudulent purchases.

76.     ArbiterSports also was – and at all relevant times has been – aware of the importance of safeguarding its users' Personal Information and of the foreseeable consequences that would occur if its data security systems were breached, including the fraud losses and theft that would be imposed on its users.

E.     **The ArbiterSports Data Breach**

77.     On or around August 24, 2020, legal counsel for ArbiterSports began providing notices to Attorneys General in various states notifying them of a data security incident involving the Personal Information of ArbiterSports' users who were residents in their respective states.

78.     On August 25, 2020, ArbiterSports mailed and/or emailed Plaintiffs and many Class Members a "Notification of Data Security Incident", which stated: "We are writing to notify you that we recently identified and addressed a data security incident that involved some of your information." In some cases, the "Notification of Data Security Incident" that was provided to Class Members mistakenly stated: "We are writing to notify you that we recently identified and addressed a data security incident that involved some of your child's [sic] information."

79.     In the August 25, 2020 notice, under the heading "What Happened," ArbiterSports reported very few specific factual details of what had occurred but disclosed that they had "recently" detected unauthorized access to certain devices in their network and an attempt to encrypt their systems, that they took measures to stop the access, launched an investigation, and engaged a security firm.

80.     ArbiterSports reported that the security firm completed its investigation on July 15, 2020, having found that a backup copy of the Database, which ArbiterSports made for business continuity reasons, was obtained by the attacker "*at some point in the prior few weeks.*"

81.     ArbiterSports reported that the database file involved supported ArbiterGame, ArbiterOne, and ArbiterWorks and contained information about ArbiterSports' users, including account username and password, name, address, date of birth, email address, and Social Security number. On information and belief, other personal information, including but not limited its

users' financial information, was also accessed, compromised and/or stolen during or as a result of the Data Breach.

82.     ArbiterSports further reported that the passwords and Social Security numbers of the users were encrypted in the file, but the attacker was able to decrypt the data, specifically users' passwords and Social Security numbers.

83.     ArbiterSports reported that it was able to prevent the attacker from encrypting its devices, but that the attacker demanded payment in exchange for deleting the files (i.e., the Personal Information of 540,000 individual users, including user names, passwords and Social Security numbers) that had been accessed, obtained and/or decrypted.

84.     ArbiterSports reported that they reached an "agreement" with the attacker, and obtained "confirmation" that the attacker deleted the files, after, presumably, ArbiterSports paid the ransom payment that had been demanded.

85.     ArbiterSports has failed to publicly disclose when exactly the Data Breach occurred, how long the Data Breach lasted, how long its users' Personal Information was exposed, or the specific date when ArbiterSports detected and became aware of the Data Breach.

86.     In the August 25, 2020 notice, by stating that the company "identified and addressed" the incident by reaching an "agreement" and obtaining "confirmation" that the attacker deleted the files, ArbiterSports improperly misrepresented and/or suggested to its users, including Plaintiffs and Class Members, that they had solved the problem even though they had not, as there is no conceivable way that an attacker could have provided proof that he/she deleted the files that he/she had had in his/her possession for, at least, a "few weeks", or that the stolen data was not already copied and distributed elsewhere, including but not limited to on the dark web.

87.     Although Plaintiffs and Class Members are at a significant and imminent risk of future harm of identity theft and fraud, and various users have already been the victims of actual misuse of the confidential Personal Information by criminals, and despite ArbiterSports' knowledge that its individual users will continue to be at such risk beyond one year, ArbiterSports has only offered a "complimentary" one year membership of credit monitoring and identity theft protection services to those individual users that both received the notice and took the additional steps to sign up for the "complimentary" credit monitoring and identity theft protection services.

**F.      The Data Breach Was A Direct Result Of ArbiterSports' Inadequate Data Security And Violation Of Data Security Standards**

88.     ArbiterSports' computer systems and data security practices were grossly inadequate to secure the highly sensitive and valuable Personal Information that had been entrusted to the company by ArbiterSports' users, and allowed the attacker to easily access its Database and to steal the users' Personal Information..

89.     ArbiterSports failed to take even the most basic industry-accepted data security precautions, including but not limited to failing to use of multi-factor authentication to verify its users' identities, which could have prevented the attacker from accessing the ArbiterSports Database and could have protected ArbiterSports' individual users' Personal Information.

90.     ArbiterSports failed to use current industry-standard 256-bit encryption technology (which has been the industry-standard since 2018) and failed to use reasonable encryption policies, allowing the attacker to not only access the ArbiterSports Database, but to also decrypt the users' highly sensitive Personal Information.

24

91.     ArbiterSports failed to even implement simple IT maintenance systems that would have discovered the attacker. ArbiterSports failed to implement monitoring and alerting that would have alerted the company to the attack during the weeks that the attack was ongoing.

92.     Even if the attacker gained access to the ArbiterSports Database, ArbiterSports could have and should have, but failed to, timely discover and properly respond to the Data Breach before any data was stolen. There were numerous steps along the way when any company following industry-standard security practices would have stopped the attacker but ArbiterSports failed to take even these basic precautions and also compounded its failures by paying ransom to the attacker – indicating that ArbiterSports either (i) did not have an incident response plan to minimize the scale and damage of data breaches and ransomware attacks; (i) did not have an adequate incident response plan that included ransomware attacks; or (iii) had an incident response plan, but failed to follow it.

93.     ArbiterSports also failed to adequately provide timely and accurate notice to Plaintiffs and Class Members of the Data Breach. On information and belief, ArbiterSports discovered the Data Breach in June 2020, but did not announce the Data Breach to its users until August 25, 2020.

94.     ArbiterSports also improperly communicated to its users that, by reaching an agreement with the attacker and paying the ransom to the attacker in return for confirmation that the stolen files had been deleted, ArbiterSports had "identified and addressed" the data security incident – thus, misrepresenting and/or inaccurately suggesting to its users that it had solved the problem, when it clearly had not.

95.     Moreover, although in its August 25, 2020 notice, ArbiterSports stated that it has "implemented additional measures and changes to enhance the security of [its] network,"

ArbiterSports did not state or indicate that it had third-party validation of those additional security measures to ensure their efforts were meaningful or impactful. Accordingly, upon information and belief, ArbiterSports has still not implemented necessary computer systems and data security practices to ensure that its users' Personal Information, which continues to be stored in the ArbiterSports Database, will not be accessed or stolen by additional attacks.

96.     Upon information and belief, the remediation measures implemented by ArbiterSports following the Data Breach provided only an immediate stop to the present attack and did not adequately address the policies, procedures, management methods, or practices which allowed the Data Breach to occur in the first place. Each day, new individual users' Personal Information is entered into the ArbiterSports Database, and this Personal Information is at risk until ArbiterSports improves its data security. ArbiterSports must put into place a security management framework, and accompanying processes and procedures, as defined by numerous government standards, and conduct audits by third-party independent auditors on a regular basis, to ensure that it keeps abreast of future threats to the Personal Information in its care.

G.     **The Data Breach Damaged Plaintiffs and Class Members**

97.     As a result of ArbiterSports' deficient security measures, failure to timely and adequately detect the Data Breach, and failure to timely and accurately disclose the Data Breach, Plaintiffs and Class Members have suffered an ascertainable loss of money or property, real or personal, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information and the loss in value of their Personal Information, loss of time and expenses related to monitoring their financial accounts and other online accounts for fraudulent activity and opening new accounts due to fraudulent activity, and an increased, imminent risk of

fraud and identity theft. Additionally, various users have already been the victims of the actual misuse of the confidential Personal Information by criminals.

98. The attacker carried out the Data Breach and stole the Personal Information of ArbiterSports' users, including Plaintiffs and Class Members, with the intent to use it for fraudulent purposes and/or sell it.

99. Personal information, including the Personal Information stolen in the ArbiterSports' Data Breach, is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for many years.

100. Social Security numbers are particularly useful tools for criminals in identity theft and are damaging to victims because it typically takes some time for the victim to become aware of the theft and can cause significant harm to the victim's credit rating. Moreover, unlike other personal information, Social Security numbers cannot be easily changed and their misuse can continue for years into the future. Even if an individual overcomes the barriers to changing his/her Social Security number, the defensive measure is still not a guarantee of protection, as credit bureaus may combine the credit records from the victim's old Social Security number with those from his/her new Social Security number, and, even when the old credit information is not associated with the new Social Security number, the absence of any credit history under the new Social Security number may make it difficult for the victim to obtain credit.

101. Account usernames and passwords stolen in data breaches are also particularly valuable to criminals due to the fact that many individual users and consumers recycle the same usernames and passwords across multiple websites, apps and online services and the criminals

can use the stolen account usernames and passwords to log on and break into the victim's other online accounts.

102.    Additionally, with access to an individual's Personal Information, including the Personal Information stolen in the ArbiterSports' Data Breach, criminals can use the data to send highly targeted phishing emails to obtain even more sensitive information. Criminals can use the data to commit potential crimes, including, for example, opening new financial accounts in Plaintiffs' and Class Members' names; taking out loans in Plaintiffs' and Class Members' names; obtaining a driver's license or official identification card in Plaintiffs' and Class Members' names but with the thief's picture; using the Plaintiffs' and Class Members' name and Social Security number to obtain government benefits; or, filing a fraudulent tax return using the Plaintiffs' and Class Members' information. In addition, identity thieves may obtain a job using the Plaintiffs' and Class Members' Social Security number, rent a house or receive medical services in the Plaintiffs' and Class Members' names, and may even give the Plaintiffs' and Class Members' Personal Information to police during an arrest resulting in an arrest warrant being issued in the Plaintiffs' and Class Members' names.

103.    Plaintiffs and Class Members have and will continue to experience an increased likelihood of identity theft and fraud going forward as direct and proximate result of the ArbiterSports Data Breach.

104.    The injuries suffered by Plaintiffs and Class Members include:

    (a)    a substantial and imminent risk of theft of their personal and financial information;

    (b)    a substantial and imminent risk of loss or delay of tax refunds as a result of fraudulently filed tax returns;

28

(c)     out-of-pocket costs associated with the detection and prevention of identity theft and unauthorized use of their Personal Information and financial, business, banking, and other accounts, such as identity theft protection, credit monitoring fees, credit report fees, credit freeze fees, fees for replacement cards, and similar costs related to the Data Breach;

(d)     costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, disputing fraudulent charges, cancelling credit cards, resetting automatic payment links to new cards, purchasing credit monitoring and identity theft protection services, the imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, including additional phishing emails and phone scams;

(e)     the imminent and certain impending injury arising from fraud and identify theft posed by their Personal Information being placed in the hands of attackers;

(f)     damages caused by ArbiterSports' failure to disclose the ArbiterSports Data Breach in a timely and accurate fashion;

(g)     continued risk to Plaintiffs' and Class Members' Personal Information, which remains in the possession of ArbiterSports and which is subject to further breaches so long as ArbiterSports fails to undertake appropriate

and adequate measures to protect the Personal Information that Plaintiffs and Class Members entrusted to ArbiterSports; and

(h)    direct injury by various users arising out of the actual misuse of the confidential Personal Information by criminals.

105.    Additionally, a victim whose Personal Information has been stolen or compromised may not see the full extent of identity theft or fraud until long after the initial breach. Identity thieves often hold stolen data for years before using it, to avoid detection. Thus, Plaintiffs and Class Members must vigilantly monitor their financial accounts and other online accounts ad infinitum.

106.    ArbiterSports has taken few affirmative steps – beyond notifying users and providing them with minimal information about the Data Breach and merely offering one free year of credit monitoring and identity theft protection services. One year of credit monitoring is woefully inadequate to protect Plaintiffs and Class Members from a virtual lifetime of identity theft risk and does nothing to reimburse Plaintiffs and Class Members for the injuries they have already suffered and will suffer. ArbiterSports' efforts are/were wholly insufficient to combat the indefinite and undeniable risk of identity theft and fraud.

**H.    ArbiterSports' Arbitration Notice Is Unconscionable and Unenforceable**

107.    At the bottom of ArbiterSports' homepage, www.arbitersports.com, ArbiterSports provided a link to its "Terms and Conditions," which purportedly "states the terms and conditions under which the subscriber may use the ArbiterSports Web Site."

108.    The "Terms and Conditions" are dated January 22, 2018. Most of the sports officials and event workers who were/are ArbiterSports users began using the ArbiterSports'

platform and software and/or provided their Personal Information to ArbiterSports prior to the publication of these Terms and Conditions.

109.    Section 5.15 of the Terms and Conditions ("Arbitration"), provides that "[a]ny controversy or claim arising out of or relating to this Agreement, or breach thereof, shall be settled exclusively through final and binding arbitration, rather than in court, in accordance with the rules and procedures of the American Arbitration Association in Salt Lake City, Utah. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. Each party shall have the right of discovery as set forth in the Federal Rules of Civil Procedure" (the "Arbitration Notice"). The Arbitration Notice found on ArbiterSports' homepage is both illusory and procedurally and substantively unconscionable and therefore unenforceable for a number of reasons.

110.    ArbiterSports' individual users, consisting of approximately 540,000 sports officials and event workers in the United States, did not and do not individually contract with ArbiterSports to use the ArbiterSports platform, but were instead required to use that platform by associations, leagues, conferences, schools and/or assignors, in order to receive game and/or event assignments and receive payment for services performed at these games and events.

111.    The terms of the Terms and Conditions conflict with the terms of the Privacy Policy.

112.    The terms of the Terms and Conditions conflict with the terms of an ArbiterPay User Agreement which can also be found on the ArbiterSports' website, and among other things, does not contain an arbitration provision.

113.    The Data Breach described herein and the resulting injury and risk of harm to the individual users of ArbiterSports did not arise out of or relate to the Terms and Conditions.

114.    The first paragraph of the Terms and Conditions states: "The Company may revise this Agreement at any time without notice by updating this Agreement on the ArbiterSports Web Site. You should visit this web page periodically to review this Agreement. Your continued use of the ArbiterSports Web Site means that you accept and agree to any revisions to this Agreement. If you disagree with this Agreement (as amended from time to time) or are dissatisfied with this Web Site, your sole and exclusive remedy is to discontinue using this Web Site."

115.    Additionally, section 5.02 of the Terms and Conditions affirms "This Agreement may be amended at any time from time to time by the Company without specific notice to Subscriber."

116.    The Arbitration Notice is illusory because, among other things, ArbiterSports has complete, unfettered discretion to change and/or remove the Arbitration Notice at its own whim and without prior notice to or with the consent of users. ArbiterSports would not need to provide any notice of such change to the individual users and could even effect such change retroactively. As such, ArbiterSports has not actually committed to anything and the Arbitration Notice is illusory and unenforceable.

117.    The Arbitration Notice does not delegate questions or arbitrability to the arbitrator. To the extent that such delegation is alleged by ArbiterSports, it is illusory and unenforceable. ArbiterSports has complete, unfettered discretion to change and/or remove any delegation clause without so much as providing notice to its individual users and may make those changes retroactively. Thus, to the extent there is a delegation clause, it lacks consideration and is illusory and unenforceable.

118.    The Arbitration Notice is procedurally unconscionable because, among other things, individual users had no ability to negotiate the term, had no other source to obtain the services provided by ArbiterSports, and most users lacked business acumen and experience. This is particularly true as to the minors who are sports officials or event workers and are users of ArbiterSports. The individual users had no meaningful choice in the inclusion of an arbitration provision and the provision is presented on a "take-it-or-leave-it" basis. ArbiterSports never explained to its individual users, including Plaintiffs and Class Members, the implications of the Arbitration Notice.

119.    The Arbitration Notice is substantively unconscionable because, among other things, it fails to provide for alternative methods of arbitration in the event of small claims, fails to meet commercially reasonable standards, and takes advantage of the captive audience of users who cannot obtain the services elsewhere.

120.    The Arbitration Notice is also substantively unconscionable because, among other things, it imposes prohibitive costs on potential plaintiffs.

121.    Accordingly, if and to the extent that ArbiterSports claims that its Arbitration Notice is enforceable against Plaintiffs and Class Members for these and other reasons, Plaintiffs and Class Members seek declaratory relief declaring such provision unenforceable.

## V.    CLASS ACTION ALLEGATIONS

122.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3) and 23(c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of those provisions.

123.    The Class is defined as:

**Nationwide Class**: All individuals residing in the United States whose Personal Information was provided to ArbiterSports and maintained on the ArbiterSports Database, and whose Personal Information was accessed, compromised or stolen from ArbiterSports as a result of the Data Breach announced by ArbiterSports on or around August 24, 2020.

124.    Excluded from the Class are ArbiterSports and any of its respective officers, directors, legal representatives, employees, successors, subsidiaries and assigns. Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff, and persons who timely and properly exclude themselves from the Class.

125.    In the alternative, Plaintiffs bring this action individually and on behalf of a subclass of Pennsylvania residents only who are members of the above-defined Class.

126.    **Numerosity**: The members of the Class are so numerous and geographically dispersed throughout the United States such that joinder of all members is impracticable. Plaintiffs believe there are approximately 540,000 ArbiterSports' individual users in the Class. The exact number and identity of Class Members is unknown to Plaintiffs at this time and can only be ascertained from information and records in the possession, custody, or control of ArbiterSports.

127.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and Class Members, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, *inter alia*, the following:

(a)    Whether ArbiterSports failed to use reasonable care and reasonable methods to secure and safeguard Plaintiffs' and Class Members' Personal Information;

34

(b)  Whether ArbiterSports properly implemented its purported security measures to protect Plaintiffs' and Class Members' Personal Information from unauthorized capture, dissemination, and misuse;

(c)  Whether ArbiterSports' computer system systems and data security practices used to protect Plaintiffs' and Class Members' Personal Information violated federal, state and local laws, or ArbiterSports' duties;

(d)  Whether ArbiterSports took reasonable measures to determine the extent of and to properly respond to the Data Breach after it first learned of same;

(e)  Whether ArbiterSports failed to timely and accurately notify Plaintiffs and Class Members about the Data Breach as soon as practical and without delay after the Data Breach was discovered;

(f)  Whether ArbiterSports was otherwise negligent in failing to properly secure and protect Plaintiffs' and the other Class Members' Personal Information;

(g)  Whether ArbiterSports violated the Federal Trade Commission Act, the Gramm-Leach-Bliley Act, or Pennsylvania consumer protection and breach notification statutes, applicable to Plaintiffs and Class Members;

(h)  Whether ArbiterSports engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiffs' and Class Members' Personal Information properly and/or as promised;

(i)  Whether implied contracts existed between ArbiterSports, on the one hand, and Plaintiffs and Class Members, on the other;

(j)  Whether ArbiterSports' conduct described herein constitutes a breach of their implied contracts with Plaintiffs and Class Members;

35

    (k)     Whether Plaintiffs and Class Members are entitled to damages as a result of ArbiterSports' wrongful conduct;

    (l)     Whether this Court has subject matter jurisdiction and whether venue in this District is proper;

    (m)    Whether equitable or injunctive relief is appropriate to redress ArbiterSports' wrongful conduct; and

    (n)     What injunctive relief is appropriate to redress the imminent and currently ongoing harm faced by Plaintiffs and Class Members.

128.    **Typicality**: Plaintiffs' claims are typical of the claims of Class Members. Plaintiffs and Class Members sustained damages as a result of ArbiterSports' uniform wrongful conduct during transactions with them.

129.    **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Class, and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Class, and there are no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the members of the proposed Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

130.    **Risks of Prosecuting Separate Actions**: This case is appropriate for certification because prosecution of separate actions would risk either inconsistent adjudications which would establish incompatible standards of conduct for ArbiterSports or would be dispositive of the interests of members of the proposed Class. Furthermore, the ArbiterSports Database still exists,

and is still vulnerable to future attacks – one standard of conduct is needed to ensure the future safety of the ArbiterSports Database.

131.   **Policies Generally Applicable to the Class**: This case is appropriate for certification because ArbiterSports has acted or refused to act on grounds generally applicable to the Plaintiffs and the proposed Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct towards members of the Class, and making final injunctive relief appropriate with respect to the proposed Class as a whole. ArbiterSports' practices challenged herein apply to and affect the members of the Class uniformly, and Plaintiffs' challenge to those practices hinges on ArbiterSports' conduct with respect to the proposed Class as a whole, not on individual facts or law applicable only to Plaintiffs.

132.   **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the members of the Class. The injuries suffered by each individual member of the Class are relatively small in comparison to the burden and expense of individual prosecution of the litigation necessitated by ArbiterSports' conduct. Absent a class action, it would be virtually impossible for individual members of the Class to obtain effective relief from ArbiterSports. Even if members of the Class could sustain individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties, including the Court, and would require duplicative consideration of the common legal and factual issues presented here. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court.

VI.    CAUSES OF ACTION

**COUNT I**
**NEGLIGENCE**
**(On behalf of Plaintiffs and the Nationwide Class or,**
**in the alternative, the Pennsylvania Subclass)**

133.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

134.    ArbiterSports knew, or should have known, of the risks inherent in collecting and storing the Personal Information of Plaintiffs and Class Members.

135.    As described above, ArbiterSports owed duties of care to Plaintiffs and Class Members whose Personal Information had been entrusted with ArbiterSports.

136.    ArbiterSports had a duty of care to use reasonable means to secure and safeguard the sensitive Personal Information and to prevent disclosure of the Personal Information to unauthorized individuals. ArbiterSports' duty included a responsibility to implement processes by which it could detect a data breach of this type and magnitude in a timely manner.

137.    ArbiterSports owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry-standards regarding data security and the various requirements and rules discussed above.

138.    ArbiterSports' duty of care arose as a result of, among other things, the special relationship that existed between ArbiterSports and its users. ArbiterSports was the only party in a position to ensure that its systems and processes were sufficient to protect against the foreseeable risk that a data breach could occur, which would result in substantial harm to its users.

139.    Also, ArbiterSports had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to use reasonable measures to protect confidential consumer data.

140.    ArbiterSports had a duty, under Gramm-Leach-Bliley Act (15 U.S.C. § 6801), to protect the security and confidentiality of Plaintiffs' and Class Members' Personal Information.

141.    ArbiterSports also had a duty under various state laws and regulations, including, but not limited to, the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. §§ 201-1 *et seq.*, and the Pennsylvania Breach of Personal Information Notification Act, 73 Pa.C.S. §§ 2301 *et seq.*, to protect the privacy and security of Plaintiffs' and Class Members' Personal Information, including Social Security numbers, and to disclose the Data Breach to them in a timely and accurate fashion.

142.    ArbiterSports breached their duties to Plaintiffs and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Personal Information.

143.    ArbiterSports breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Personal Information despite promising in its Privacy Policy: "We use industry-standard methods to protect your personally identifying information from unauthorized access."

144.    ArbiterSports' negligent acts and omissions include, but are not limited to, the following:

> (a)    failure to meet and maintain industry-accepted standards for data security and the protection of Personal Information;

39

(b)     utilizing grossly inadequate computer systems and data security practices;

(c)     failure to utilize and follow standard IT security practices;

(d)     failure to utilize current industry-standard encryption technology and to have proper and reasonable encryption policies and practices in place;

(e)     failure to use multi-factor authentication to verify its users' identities;

(f)     failure to track and monitor access to its network and user data;

(g)     failure to adequately staff and fund its data security operations;

(h)     failure to use due care in hiring, promoting, and supervising those responsible for its data security operations;

(i)     failure to effectively train and educate employees about the risks of data compromise, their role in prevention and how to respond in the event of an incident;

(j)     failure to create a reasonable data retention plan;

(k)     failure to have a reasonable incident response plan to minimize the scale and damage of data breaches and ransomware attacks, including the Data Breach;

(l)     failure to have mock incident testing;

(m)     failure to maintain and have in place adequate intrusion detection systems;

(n)     failure to timely recognize that an attacker was stealing users' Personal Information from its network while the Data Breach was taking place;

(o)     failure to take adequate data security measures after first learning of the Data Breach in order to prevent further compromise of its individual

40

users' Personal Information and prevent or otherwise limit the attacker's

ability to access, obtain and decrypt the users' Personal Information; and

(p)  failure to timely and accurately disclose the Data Breach to the Plaintiffs

and Class Members.

145.    ArbiterSports acted with wanton disregard for the security of Plaintiffs' and Class

Members' Personal Information. ArbiterSports knew or should have known that ArbiterSports

had inadequate computer systems and data security practices to safeguard such information, and

ArbiterSports knew or should have known that the attacker was attempting to access the Personal

Information in its Database.

146.    But for ArbiterSports' negligent breach of their duties owed to Plaintiffs and

Class Members, Plaintiffs and Class Members would not have been injured.

147.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably

foreseeable result of ArbiterSports' breach of their duties. ArbiterSports knew or should have

known that they were failing to meet their duties, and that the Data Breach would cause Plaintiffs

and Class Members to experience the foreseeable harms associated with the exposure of their

Personal Information.

148.    As a direct and proximate result of ArbiterSports' negligent conduct, Plaintiffs

and Class Members have suffered injury and various types of damages suffered as alleged above

and are entitled to damages in an amount to be proven at trial.

149.    Plaintiffs and Class Members are entitled to compensatory and consequential

damages suffered as a result of the Data Breach.

150.    Plaintiffs and Class Members are also entitled to injunctive relief requiring

ArbiterSports to (among other things): (i) strengthen its data security systems and monitoring

procedures; (ii) submit to future annual audits of those systems; and (iii) provide five years of free credit monitoring and identity theft protection to all Class Members.

## COUNT II
### GROSS NEGLIGENCE
**(On behalf of Plaintiffs and the Nationwide Class or, in the alternative, the Pennsylvania Subclass)**

151.   Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

152.   As described above, ArbiterSports owed duties of care to Plaintiffs and Class Members whose Personal Information had been entrusted with ArbiterSports.

153.   ArbiterSports, with reckless disregard for the safety and security of the Personal Information it was entrusted with, breached the duty of care owed to Plaintiffs and Class Members by failing to implement reasonable security measures to secure and safeguard their sensitive Personal Information and to prevent disclosure of the Personal Information to unauthorized individuals.

154.   In failing to employ the most basic and well-known IT security measures, ArbiterSports departed from the reasonable standard of care and violated its duty to protect Plaintiffs' and Class Members' Personal Information.

155.   ArbiterSports further breached its duty of care by allowing the breach to continue undetected and unimpeded for months after the attacker first gained access to ArbiterSports' systems.

156.   The unauthorized access to Plaintiffs' and Class Members' Personal Information was reasonably foreseeable to ArbiterSports.

157.     Neither Plaintiffs nor the Class Members contributed to the Data Breach or ArbiterSports' employment of insufficient security measures to safeguard their Personal Information.

158.     As a direct and proximate cause of ArbiterSports' reckless conduct, Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

159.     It was foreseeable to ArbiterSports that its reckless conduct could result in injury to its users.

160.     Plaintiffs and Class Members suffered various types of damages as alleged above.

161.     ArbiterSports' reckless conduct was a proximate cause of Plaintiffs' and Class Members' damages.

162.     Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

163.     Plaintiffs and Class Members are also entitled to injunctive relief requiring ArbiterSports to (among other things): (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide five years of free credit monitoring and identity theft protection to all Class Members.

### COUNT III
### NEGLIGENCE PER SE
**(On behalf of Plaintiffs and the Nationwide Class or,
in the alternative, the Pennsylvania Subclass)**

164.     Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

165.    Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), ArbiterSports had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Personal Information.

166.    Pursuant to the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), ArbiterSports had a duty to protect the security and confidentiality of Plaintiffs' and Class Members' Personal Information.

167.    ArbiterSports breached its duties to Plaintiffs and Class Members under the Federal Trade Commission Act (15 U.S.C. § 45) and the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Personal Information.

168.    The harms suffered by the Plaintiffs and Class Members, as described herein, were the type of harms that these federal statutes were intended to prevent.

169.    ArbiterSports' failure to comply with both of these applicable laws constitute negligence *per se*.

170.    But for ArbiterSports' negligent breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

171.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of ArbiterSports' breach of its duties. ArbiterSports knew or should have known that it was failing to meet its duties, and that ArbiterSports' breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Personal Information.

172.    Had Plaintiffs and Class Members known that ArbiterSports did and does not adequately protect sensitive user data, they would not have provided their Personal Information to ArbiterSports.

173.    As a direct and proximate result of ArbiterSports' negligence *per se*, Plaintiffs and Class members have sustained immediate, tangible injury as a direct result of the Data Breach. They have suffered the loss of their legally protected interest in the confidentiality and privacy of their Personal Information and the loss in value of their Personal Information, they have and will expend significant time and expense related to monitoring their financial accounts for fraudulent activity, and they are at an increased, imminent risk of fraud and identity theft. Plaintiffs' and Class Members' injuries are ongoing, as their Personal Information continues to be stored in the ArbiterSports Database which, upon information and belief, continues to fail to utilize even the most basic data security precautions, and they continue to face a significant and imminent risk of identity theft and fraud from the Data Breach as well as from further data breaches of the ArbiterSports Database.

<u>COUNT IV</u>
**BREACH OF IMPLIED CONTRACTS**
**(On behalf of Plaintiffs and the Nationwide Class or,**
**in the alternative, the Pennsylvania Subclass)**

174.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

175.    When Plaintiffs and Class Members provided their Personal Information to ArbiterSports in exchange for the use of ArbiterSports' products and platform, they entered into implied contracts with ArbiterSports under which ArbiterSports agreed to take reasonable steps to protect their Personal Information data.

176.   When entering into the implied contracts, Plaintiffs and Class Members reasonably believed and expected that ArbiterSports' data security practices complied with relevant laws, regulations, and industry standards.

177.   Plaintiffs and Class Members would not have provided their sensitive Personal Information to ArbiterSports in the absence of ArbiterSports' implied promise to keep the sensitive Personal Information reasonably secure.

178.   Plaintiffs and Class Members fully performed their obligations under the implied contracts.

179.   ArbiterSports breached its implied contracts with Plaintiffs and Class Members by failing to implement reasonable data security measures.

180.   As a direct and proximate result of ArbiterSports' breaches of the implied contracts, Plaintiffs and Class Members sustained damages as alleged herein.

181.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

### COUNT V
### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### 73 Pa.C.S. §§ 201-1 *et seq.*
### (On behalf of Plaintiffs and the Pennsylvania Subclass)

182.   Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

183.   ArbiterSports, while operating in Pennsylvania, engaged in unconscionable commercial practices, deception, misrepresentation, and the knowing concealment, suppression, and omission of material facts with intent that others rely on such concealment, suppression, and omission, in connection with the sale and advertisement of services, in violation of the

46

Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S. 201-1 *et seq.* This includes, but is not limited to the following:

(a)   ArbiterSports failed to enact adequate privacy and security measures to protect Plaintiffs' and Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach;

(b)   ArbiterSports failed to take proper action following known security risks, which was a direct and proximate cause of the Data Breach;

(c)   ArbiterSports knowingly and fraudulently misrepresented that it would maintain adequate data privacy and security practices and procedures to safeguard Plaintiffs' and Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

(d)   ArbiterSports omitted, suppressed, and concealed the material fact of the inadequacy of its privacy and security protections for the Plaintiffs' and Class Members' Personal Information;

(e)   ArbiterSports knowingly and fraudulently misrepresented that it would comply with industry-based standards pertaining to the privacy and security of Plaintiffs' and Class Members' Personal Information;

(f)   ArbiterSports failed to maintain the privacy and security of Plaintiffs' and Class Members' Personal Information, in violation of duties imposed by applicable federal and state laws, directly and proximately causing the Data Breach; and

(g)    ArbiterSports failed to disclose the Data Breach to Plaintiffs and Class Members in a timely and accurate manner, in violation of the duties imposed by the Pennsylvania Breach of Personal Information Notification Act, 73 Pa.C.S. §§ 2301 *et seq.*

184.    As a direct and proximate result of ArbiterSports' practices, Plaintiffs and Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information and loss of value of their Personal Information, loss of time and expenses related to monitoring their financial accounts for fraudulent activity, loss of time and expenses related to opening new banking accounts and obtaining new debit cards due to fraudulent activity, and increased, imminent risk of fraud and identity theft.

185.    The above unlawful and deceptive acts and practices and acts by ArbiterSports were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

186.    ArbiterSports knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiffs' and Class Members' Personal Information and that risk of a data breach or theft was highly likely. ArbiterSports' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful.

187.    Plaintiffs and Class Members justifiably relied upon ArbiterSports to maintain and ensure the security of their Personal Information and would not have otherwise disclosed their Personal Information to ArbiterSports had they known of the inadequate security

protections and procedures in place Plaintiffs and Class Members seek relief under 73 Pa. C.S.

201-1 *et seq*., including, but not limited to, injunctive relief, other equitable actual damages (to

be proven at trial), treble damages, and attorneys' fees and costs.

**COUNT VI**
**ACTION FOR DECLARATORY RELIEF**
**(On behalf of Plaintiffs and the Nationwide Class or,**
**in the alternative, the Pennsylvania Subclass)**

188.   Plaintiffs re-allege and incorporate by reference all preceding allegations as if

fully set forth herein.

189.   ArbiterSports' website, www.arbitersports.com, contains Terms and Conditions

which purport to require mandatory arbitration of any disputes. This arbitration provision is

unenforceable for a number of reasons.

190.   An actual controversy has arisen and now exists between Plaintiffs and Class

Members, on the one hand, and ArbiterSports, on the other hand, concerning their respective

rights and duties under the arbitration provision of the Terms and Conditions contained on

ArbiterSports' website, particularly where the ArbiterPay Users' Agreement, which can also be

found on the ArbiterSports' website, does not provide a similar clause. Plaintiffs and Class

Members contend that the arbitration provisions are invalid and unenforceable for the reasons set

forth above. Plaintiffs are informed and believe, and upon such information and belief allege that

ArbiterSports believes and contends that the arbitration provisions of the Terms and Conditions

contained on ArbiterSports' website are valid and enforceable. Plaintiffs and Class Members

desire a determination of their rights and duties under the arbitration provision of the Terms and

Conditions, and a declaration that this provision is invalid and unenforceable as to Plaintiffs and

Class Members.

## VII.   RELIEF REQUESTED

191.    Plaintiffs, on behalf of all others similarly situated, request that the Court enter judgment against ArbiterSports including the following:

A.    Determining that this matter may proceed as a class action and certifying the Class, or alternatively, the Subclasses asserted herein;

B.    Appointing Plaintiffs as representatives of the Class and appointing Plaintiffs' counsel as class counsel;

C.    An award to Plaintiffs and the Class of compensatory, consequential, statutory, and treble damages as set forth above;

D.    Ordering preliminary and permanent injunctive relief requiring ArbiterSports to (among other things): (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide five years of free credit monitoring and identity theft protection to Plaintiffs and all Class Members;

E.    Declaratory judgment determining the rights and obligations between Plaintiffs and Class Members, on the one hand, and ArbiterSports on the other hand, concerning their respective rights and duties under the arbitration provisions of the Terms and Conditions contained on ArbiterSports' website, including a declaration that the arbitration provision is invalid and unenforceable and that questions of arbitrability have not been delegated;

F.    An award of attorneys' fees, costs, and expenses, as provided by law or equity;

G.    An award of pre-judgment and post-judgment interest, as provided by law or equity; and

H.      Such other relief as the Court may allow.

## VIII.  JURY TRIAL DEMAND

Plaintiffs demands a trial by jury on all issues so triable.

Dated: October 19, 2020                     Respectfully submitted,


                                            */s/ Scott H. Wolpert*
                                            Scott H. Wolpert (PA Bar No. 62894)
                                            Christine M. Gordon (PA Bar No. 209391)
                                            Keith T. Vernon*
                                            **TIMONEY KNOX, LLP**
                                            400 Maryland Drive
                                            Fort Washington, PA 19034
                                            Tel: (215) 540-2656
                                            swolpert@timoneyknox.com
                                            kvernon@timoneyknox.com
                                            cgordon@timoneyknox.com

                                            Jonathan Shub (PA Bar No. 53965)
                                            Kevin Laukaitis (PA Bar No 321670)
                                            **SHUB LAW FIRM, LLC**
                                            134 Kings Highway East, 2nd Floor
                                            Haddonfield, NJ 08033
                                            Tel: (610) 453-6551
                                            jshub@shublawyers.com
                                            klaukaitis@shublawyers.com

                                            *Pro Hac Vice Application to be submitted*

                                            *Attorneys for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 19, 2020, a true and correct copy of the above and foregoing was filed with the Clerk of Court via the Court's CM/ECF system for electronic service on all counsel of record.


Dated: October 19, 2020                    By:    */s/ Scott H. Wolpert*_____
                                                   Scott H. Wolpert